Appellant v. Jeh Charles Johnson Secretary of Homeland Security Mr. Reneau for the Appellant, Mr. Guzman for the Appellee Good morning, Your Honors. Ellen Reneau for the Appellant, Plaintiff Danita Walker. We're here today because the District Court and the Appellee would have this Court judge and weigh the evidence of pretext, which was ample in the record. Our position is that a reasonable jury could find that Walter Leroy was not honest in putting forth his reasons for the various actions he took. But first you get to get some evidence of discrimination. Actually, Your Honor, this Court in Brady and in ACCA, Brady v. Office of Sergeant at Arms, and the ACCA case held that once the defendant, employer, has articulated a legitimate non-discriminatory reason that... They don't have to do that until you show the discriminatory action. But they have done that, and once they've done that... They don't have to do that until you show... You've still got the burden of proving your case, which involves evidence of discrimination. They don't have to put anything on. They don't have to prove anything unless you've done that. But they have, Your Honor. You might better start there, Counsel, as to how you've shown discrimination. Well, Your Honor, I think the question is discrimination and retaliation, though none. And to hold us to the prima facie case at this point would not be proper. No, I don't think that we're asking you to reestablish a prima facie case. But there are two separate burdens on... Once the employer has articulated a legitimate non-discriminatory reason, and they've put forward the reasons that they've put forward... The burden on you, then, is to show, A, that the reasons that they've put forward are not the real reasons. They were pretextual. And, B, that the real reason was discrimination. And I have to say, some of your briefing reads as if you think you only have to do the first. And that it will flow from showing that their ostensible legitimate non-discriminatory reasons are not the real reasons, period. But then we would necessarily conclude that the real reason was discrimination. That's not how I read the law after St. Mary's Honor Center v. Hicks from the Supreme Court and our cases that follow. Okay. Well, in George v. Levitt, this Court said that usually proffering evidence of pretext is sufficient to get a case to a jury. Also, the Supreme Court said in Reeves that in appropriate circumstances, that's all you need is evidence of pretext. So is that... Am I reading your brief correctly, then, that that's really what you're resting on? You're saying, look, given the circumstances here, maybe the timing as of raising an inference of retaliation, but basically what it is is he gave a lot of different reasons for what he did. None of them stand up. That is the strength of our case. And this Court said in Tchaikovsky v. Mineta that that's the strength of most employment discrimination cases. The evidence of race discrimination is in the way that he treated Ms. Walker. I want to back you up on that. In your brief, very early on, you say Walker was his only black supporter. Now, counsel, at the lead point of your brief, the undisputed statement of uncontested facts relates that he didn't have any white subordinates for most of his time. All of his subordinates were black. She testified that her co-workers were black. Yes. And yet you come back in your rebuttal brief and refer to his white subordinates. What in the world are you talking about? She was the only black female. All right, but you're not claiming gender discrimination. No, I didn't. You didn't say she was the only black female. You said the only black. And then in your rebuttal brief, you refer to his white subordinates. You didn't say much. I believe I said she was the only black and female. Counsel, I'm looking at what you said. Okay, okay, well, I may have gotten it wrong. Walker, his only black subordinate. That's what I'm looking at. I'm reading it. I don't have to remember the quote. Okay. And then you reference J.A. 488 v. Floyd and Adams. It does not support that proposition. I apologize, Your Honor. I did not. You had a chance to correct it in your rebuttal brief after it was pointed out to you by the athletes. And you tell them on your very first – no, I guess it's page five, your fifth page. Again, in your summary of argument, Denita Walker demonstrated that her supervisor treated her less favorably than his white subordinates. You don't – you persist in the same, frankly, mischaracterization of the evidence. Your Honor, that was entirely unintentional. I didn't have the case below. I didn't take the depositions. Not you personally. Yes, I apologize. I apologize. The fact is she was the only black woman. But you definitely did not claim gender discrimination. No, we did not claim gender discrimination. There isn't any argument about that. No. About racial discrimination. And retaliation. And retaliation. But I'm having a hard time finding the evidence upon which a prior effect could find discrimination here. Well, I believe that the evidence of pretext, when we show the jury that he's given false explanations, that that is sufficient to raise – that if he's treated her – hasn't treated her differently than he has persons of a different race, where is your evidence upon which a reasonable prior effect could find discrimination? So you really are – I mean, you mentioned what George – I really think it's – George v. Levitt? Yeah, I don't think that case supports what you're saying, which is that it's typical simply to rebut with evidence the legitimate non-discriminatory reasons and say they're false. I mean, way more often than not, you know, you may disagree. The person may, you know, have reasons that don't hold up. But they're the decision-makers. You have to have something that links it to race. And, you know, maybe it would be this is the only black employee in a unit that could start to get you there. But that's not true here. It's – there's really – it's very, very hard to see how someone would infer that instead of, you know, where she was from in the country, the pace of her attitude at work, her – you know, he just didn't really like her, you know, all of which are not protected by Title VII. Why would we assume that it was race? So it would be actually maybe helpful if you'd focus us and say, what do you think is the most telling evidence in this record? I think the most telling evidence is the combination of all the falsehoods. And I can go over them, but I think that – Other than the falsehoods, what evidence is there of a race discrimination? Other than – so you've got your pretext. So the pretext doesn't involve use of the word race. So it's just that you have your argument that he gave false answers or false explanations. Is there anything else in the record that points to race, or do you have to live entirely on the fact that we can say he lied? The way that he treated her. And then also – That's a – the way he treated her is every single employment case in the country. I got it. What can you point to that's race? I mean, is there something in the record that – It's only the pretext. It's only the pretext. But the retaliation is also – Yeah, just on the discrimination – Okay. Because I think we've said ordinarily pretext is enough to get to the jury. But we've said that in the context in which normally somewhere – normally there's a prima facie case that creates a presumption about race-based decision making. And I agree with you that once we're at the – an explanation is given and you're fighting about that, that's what the case is about. But you can, as Reeve says, go back and look at that prima facie evidence and include that as part of the evidence of – on your ultimate burden of persuasion that there was race involved here. Is there any case where there was nothing, nothing in the record at all to suggest race, other than the fact that the person gave contradictory, allegedly false, different answers? And in case it's pure pretext. Pure pretext. I would have to think on that. I didn't – I wasn't prepared to address that question because in our cases, typically – I'm not sure what your typical cases are. But in this case, you knew you came in here and all you had was pretext. Right. And I feel that in many of my cases all I have is pretext. I'm trying to think. I don't know off the top of my head if there's any case that had solely pretext. I do know that the George B. Levitt case, the court said that usually pretext is enough. But that wasn't even part of the holding in that case. Isn't that a case in which the difficult issue is whether, you know, one person who's alleged to have bias, that bias can be attributed to someone else who's making the decision? I mean, it's just not part of the holding in the case. It's not contextualized for us at all. And given the very clear Supreme Court guidance from St. Mary's Honor Center and several cases in our circuit that say you put the prima facie case aside, what you look at is these two questions. A, can you show their reason to be pretext? And B, that the real reason for the decision was discrimination. And certainly you can have overlapping evidence that gives rise to both of those inferences. But we need something that puts us in the retaliation and or racial discrimination box. I don't believe that's the state of the law, but I would request permission to supplement one. I believe there's a case that says it's the unusual case that requires something more than pretext in order to get to jury. That may be, but maybe the unusual one is one where there's nothing else in the record at all that points to race. And the pretext evidence is sufficiently thin that we don't think a rational jury. I mean, I think that's what the district court's decision here was. I'm just positing it back to you. But given that, there's nothing on which a rational jury can determine race discrimination. But a reasonable jury can infer from the falsity of the explanation. That it was race as opposed to gender? Yes. Why? Well, what on earth would let them know it was race rather than gender versus I just dislike you? Or taking an FMLA leave or, you know, having someone you could think, oh, well, she's got this sick mother at home. She's not going to be reliable, you know, even though she's gotten FMLA leave. She's taking it properly under FMLA procedures. It could be retaliation based on that, which I don't think you've pursued. No, what we've most strongly pursued is the retaliation claim. And I'd like to move to that because I see him. Well, before you do that, just refresh me on what your evidence of pretext is. The evidence of pretext is, well, first he charged her as AWOL and said that he didn't give permission for the acting supervisor to approve her leave. The acting supervisor says that he did give him permission. So a jury could find that he's lying about that. The second one, he says that she violated the leave restriction letter and he charges her AWOL when she does provide reasonable notice, which is what the leave restriction requires in FMLA circumstances, that you provide reasonable notice. Her mother was in dire circumstances. She called him, left a voicemail, and she also sent him an email. Now, the procedures that are outlined in the leave restriction letter are modified by the requirement that if you have an emergency situation and you can't request leave beforehand, it has to be reasonable under the circumstances. He didn't even find out what the circumstances were, but he charged her AWOL. With regard to the reprimand, he has made exaggerated claims and has changed his claims over time as to what it is she said and did when she came in and gave him a leave slip. Now, she says she was in the middle of having an asthma attack and could barely speak. He says that she said very loudly and was very rude and slammed the paper down. He says slammed in his deposition. When did that happen? What was the date of that? The date of that? The date of the incident or the? The incident. I believe the incident was in October of 2008. And when was her EEO filing? When did he become aware that she'd filed this EEO complaint? In April of 2008. In between April? I'm sorry, go ahead. The first act of retaliation, we believe, the first, even though it's not actionable on its own, is the leave restriction letter, which was June 25th. Okay, so April, May, June, so you had three months between? No, it's two months. I thought you said he learned in April and then the leave was? He learned in April, so April to May is one month and May to June is two months. I guess we don't have a date in April. Even with two months, and in between April and June, did he give her any, how did he treat her between April and June? What are your objectives between April and June? Between April and June? Did she have any contact with him? Did she seek leave from him? She did. Lots of leave from him? I wouldn't say lots of leave, no. I thought it was like 17 days or something like that in the first couple months? 20% of her assigned working days. She did seek leave, and she was under FMLA at the time, so she was seeking leave to take care of her mother. That was approved. The approval didn't come until June 16th, so between April and June 16th, he was giving, meaning all of these very extensively repeated, and you have no objection to that, there was no sign of differential treatment? I'm sorry? There was no sign that he was treating her differently than anyone else? Well, he was hostile to her all throughout. Hostile is grander, all our leave requests. It's hard to call that hostile. That's exactly what I'm asking you. What evidence of hostility do you have between April and June? Between April and June? I mean, she testified that he treated her with hostility. That's very conclusive. Yes, it is. What did she say factually that he did that was hostile between April and June? Because that's a long period to have an inference that what he did in June was to retaliate for something he learned about in April that didn't even involve him. And I'm guessing asking is a legal question of law when you have that much time and you have a lot of intervening facts that point the other direction, where he's not being hostile and no evidence of actual hostility. How does that get factored into summary judgment analysis? I think that what you're doing right now, you're talking about weighing the evidence. You're weighing the evidence. Well, you have to do something with the fact that there was a two-month gap between him learning of the EEO complaint. That's very short.  The case law has held that that standing alone is enough to show retaliation. Part of the difficulty in this case is that there is an undisputed practice on your client's part of being late and not following the procedures that are required. So, in fact, what happened from April to June is that she was absent, I think, was it 17 times, which she acknowledges that she was absent. And, in fact, her supervisor gave her a free pass on those. And then, you know, the record does not dispute those. And then, you know, she says she thinks it's unfair that he put a leave restriction on, but I think he's sort of like communicating with her as a responsible manager, okay, these are the expectations. If it's unclear, let me be clear. But the leave restriction says that when you have to take emergency FMLA, it has to be reasonable under the circumstances. Then when her mother is amassed, you know, starting fires in the kitchen and there's species all over the place, she calls and leaves a message. She also emails him, and he doesn't take any of that into consideration. Well, what he does is he says, look, we have a restriction, and what you're supposed to do if I'm not there is call the next-level supervisor. And she doesn't, right? Is that reasonable? She doesn't dispute that. Given the state her mother was in. But you don't have an FMLA claim here. You don't have an FMLA claim, I thought. No, no, no, but in the leave restriction letter, it's the procedures. What's unreasonable about that? The procedures are that you have to do what's reasonable under the circumstances. JA-117, when it's an emergency situation, when you're taking care of your mother and she's in that situation, and all you can do is make one phone call and send one email, that's reasonable. But the fact is he didn't even ask her about the circumstances. He just charged her AWOL without even considering when he knows her mother is suffering from dementia and that she's the only person taking care of her. There are regulations about what rules can be put around someone requesting FMLA leave that the Department of Labor has issued. Did you make any showing that these restrictions in the leave restriction letter departed from regulations? What regulations permit? I don't think that the phone call procedure does depart, but there's a... But it's apart from the regulation? Which regulation? I believe it does, but that's not really an issue. I didn't read the regulations. Because the leave restriction letter says at the end that if it's an emergency, you only have to do what's reasonable under the circumstances. This all sounds to me like maybe you could have had an FMLA claim. I'm trying to tie this up to how that shows he was retaliating for her filing an EEO complaint many months earlier. This was his way of retaliating? For the EEO complaint? Yes. Not for getting the FMLA leave? No, not for getting the FMLA leave. Do you have a case that says two months allows an inference of retaliation? Because I thought the time period was a lot shorter in most cases. The Supreme Court, I think it's Clark v. Brigham, said that under three months was sufficient. I think that's the case. As far as I was concerned, and I apologize for not having the cases at the tip of my tongue, but it's settled law that all you need is pretext and that three months is short enough. In the employment context, we often have a lot longer time before someone takes an action against an employee because it takes time to write it up and decide it. And is that longer time filled up with positive actions by the same? That's what makes this harder for me to figure out because there are all these positive actions and you don't have any negative actions in between, so you've got two months. But that goes to the weight of the evidence. I'm not sure. I'm asking whether that's how it should be looked at or whether, in fact, there should be a break in this inferential chain that you're asking to have made. A break. Nothing happened in between. That would be one thing. But if you have a whole pileup of leave, leave, leave, leave, leave, leave, leave, leave, leave, leave, and then you go, ah, here's another leave decision two months later, that leave decision must be retaliation. Please ignore, as a matter of law, in evaluating the evidence for summary judgment, all those 17 other granting leave decisions. Well, I believe the way you're looking at the evidence is weighing it. When you're talking about the positive things he did and weighing them against the evidence that we're reporting, a jury should have the chance to look at him, be questioned, and to have him talk about why he did what he did and why he approved leave. And Ms. Walker should also be permitted to testify. I know you're not giving much weight to the way that he treated her, but a jury might see it as significant that he was hostile to her. Okay. Thank you. I think we'll hear from the government now. Okay. Could she even say the words, he was hostile to me, without having some kind of factual representation of what it is she means by that? In front of a jury. And you ask the question to your client, was he hostile to you? Ignore if he's leaving or not. Isn't that objectionable? It's going for a conclusion. Well, that's not the way I would ask it at trial. At trial I would say, and how did he treat you? Do you really have any evidence, anything that would support her testifying he was hostile to me? Yeah, the point of summary judgment is you're supposed to come forward with that stuff you would get out at trial about how he was hostile to her. I mean, you know, you point to her testimony about he was strangely difficult, he was abrupt, he was not conversational, although not rude. She felt he was trying to be difficult with her on purpose. She couldn't guess why. So I think that's what you're referring to when you talk about the hostility, that she feels uncomfortable around him. Well, that he seems to be just uncomfortable in her presence. There again, how he seems is not a matter of evidence. You have to show something objective. She may be able to know how she feels, but to try to testify to a jury about how somebody else feels or seems, that's not the normal sort of thing we allow people to do in trial. No, I think it would be more persuasive if she testified in more detail as to why she felt he was. But, I mean, one of the things that's difficult about that testimony is it's followed by testimony that she thought that he treated Albritton and Elders Talley perfectly politely, that he was, you know, positive with them, professional, nice and respectful with them. They're also African-Americans. So in terms of, you know, what is the inference that we're getting from the facts that she's putting forward? Difficult. It's not impossible because you can be subject to discrimination based on your race, even if other people of, you know, the same broad category aren't. I'm not suggesting that, but I'm just still looking for the strongest places where you think the inference is that it's racial, that it's a pretext for discrimination as distinct from just a bad reason or wrong reason. Well, why would he give all these reasons is what a jury would have to wonder. And I didn't finish with the things that we believe are dishonest. For one, he says he never got her name on a certificate list for promotion, and the evidence shows that OPM referred her on a list. Well, the evidence shows that OPM generally referred her, but I thought the evidence also showed that the list that the decision-maker got was limited to GS-14s, and that's why she wasn't on it, that there weren't other GS-13s on it, white, black. Well, because there's more than one list. But the ultimate list they get, they're like, whoa, embarrassment of riches. Let's pick from GS-14. But the OPM letter shows that her name was referred on a GS-13 list. Months earlier. That's the bigger list. That's the veneer. No, no, no. We believe a jury can infer that because OPM usually sends more than one list, that there was more than one list, that her name was on a GS-13 list, and that he decided to pick from the 14 list because he didn't want her. Do you have any evidence that he got that other list? The evidence that he had the list is that OPM says that they gave him the list. Did they say they gave it to him, or did they send it to the decision-maker? They sent it to the selecting officials, what they said. And is he the selecting official? He was the recommending official. Okay, so who's the selecting official? They don't use that term. Is there a selecting official? All right. I mean, his recommendation is who got promoted. All right. I'm coming in now. We'll hear from the government. Okay. Thank you. May it please the Court, Mr. President, Javier Guzman on behalf of the Department of Homeland Security. Your Honors, there is no evidence in the record that gives a rise of an inference of either racial discrimination or retaliation in this case with respect to the claims that Ms. Walker has advanced in this case, and that the district court correctly granted some re-judgment. Then I'll start out with the AWOL claim that Ms. Walker has put forward. Can I ask you one thing before we get to that, just about governing law, because that's more our specialty? You invoked the Supreme Court decision in the Southwest versus Nassar or Nassar case? Correct. On the sort of but-for requirement now for retaliation claims. What are we supposed to do? Did you argue below? Did you preserve the question of whether the standard the Court was applying should have been but-for? No, Your Honor. The Nassar case post-stated the answer. Right, right. But people preserve arguments all the time, even if there's precedent. You put a saying, we'd like to be able to take advantage of that when it happens. You didn't do anything like that? Your Honor, as I stand here, I don't recall whether we raised it in our motion for summary judgment. It would have been a subsidiary point if we raised it. It wouldn't have been a principal point. Right. And then what would we have to do with something like that if we obviously try to apply the law that governs at the time of decision, but all the summary judgment briefing and through discovery, plaintiff would have understood her burden to be identifying evidence would have been done under the other standard, the lesser standard, the softer standard, like the Title VII merit standard as opposed to retaliation standard, you know, substantial factor or something like that. So the whole pre-summary, all the summary judgment process went under a different standard than this one. And so is the best thing for us to apply that governing law standard to a record that wasn't prepared by the plaintiff in light of that, or would we have to remand, or what would we do? I believe that the court could properly apply Nassar ruling or whatever intervening standard. It's hard to ding them for not coming forward with evidence of a but-for standard that didn't apply to them at the time they were coming forward with their summary judgment showing proper. And I'm having in my mind when Nassar came out, we had any number of cases at the time pending in the Title VII context that were either post-discovery or, of course, in a discovery, and raising the Nassar argument and having the district court decide cases on them. Were they post-summary judgment decision? Was it a – You said they were sort of post-discovery, but were they post-summary judgment decision being made that you're thinking of? No, at least in the cases that I – Because then there's still time to sort of go back and get a little more – if you think you need more discovery to meet the new standard, you could ask for it and you could deal with it. It's just a little hard for us to say that a plaintiff failed to make a showing that you didn't argue they had to show, that the court didn't apply to them. I think – Do you need Nassar to win? No. Well, and that, I think, is the ultimate point here, is that whether you apply the but-for causation standard of Nassar or, I guess, the mixed-motive causation theory that some courts have recognized pre-Nassar, that in either event there's nothing here that supports or raises an inference of retaliation by Mr. Leroy. And then I thought I had another legal problem, and that was the district court said that with respect to the reprimand, the unprofessional conduct, that that didn't matter. It was issued by this – I forget the acronym, but some kind of committee. And so it doesn't matter. Staub didn't – or, I'm sorry, Mr. Leroy didn't issue it. And that seemed to me a pretty clear legal error under the Staub decision from the Supreme Court. The fact that someone higher up made the decision doesn't mean we ignore whether the person feeding all the information to that decision-maker was the one who had a discriminatory motive. And so that seemed like plain legal error to me. What do you have to say about that? I don't think so, Your Honor, for a couple of reasons. One, as you suggest in your question, Staub presumes that there has to be some retaliatory animus or discriminatory animus by the person who initiates what's an ultimate employment action. So it's not that Staub creates a – almost like a safe harbor, that as long as you can point to somebody else in the process, then I'm relieved of showing that there's any kind of animus that was at play anywhere in the decision. And with respect to factually in this case, distinguishing it from Staub, is that Mr. Leroy here, and it's unsputed, he didn't have, obviously, the authority that the disciplinary and adverse action panel did to impose discipline. But he doesn't recommend any particular discipline. He simply refers the matter to the panel to look into and determine whether discipline is appropriate. What source of information did they have in making that decision other than his input? They had – and you'll see this in the declaration that Mr. Leroy submitted. The panel asked him if there were persons who were present or witnessed the incident and to collect statements if there were such persons. So if you look in the record, J.A. 150 to 150. And do these committees usually do that? They would have gotten – do we know that they went and talked to other people? Or would they ordinarily do that? Your Honor, I don't know. The record doesn't indicate here, and I don't know what the panel's practice would be. There's certainly nothing to indicate here that what the panel did was departure from procedures that were taken in other cases. But to finish the answer to your question, there were statements that were submitted by three other employees who were present during this meeting who described the incident in similar terms. It's a range of descriptions. Similar or different? A range of descriptions. I guess the point is I don't – And that – I mean, wouldn't that be a classic case of something that would go to a jury  when it's kind of from very calm and decorous to rather rude and abrupt? Well, let me take a step back in getting to the answer to that question. First of all, we've argued, and the district court found, that the reprimand for the matter of discrimination was not an adverse employment action. It didn't carry any loss of benefits or pay. This stays in the record, though, no? Pardon? It remains in the employee's record for some period of time? It remains in the record for a period of, I believe, one year, maybe two years. But it didn't serve any basis for further discipline against Ms. Walker. And under the court's decision in Bollock, which had essentially a similar reprimand in tone and also one that remained in the record as a possibility for further discipline, the court held this did not rise at a level of an adverse employment action. So we don't think with respect to the race discrimination claim, with respect to the reprimand, we even get to the issue, or the court needs to get to the issue of – I thought she wasn't arguing that. I thought she was just arguing it for the retaliation claim where you have the lesser standard. Well, I'll address you. My understanding is she's pressing the reprimand claim both for race and retaliation. But she's not resting only on the reprimand claim. And it seems like, you know, even if you could say, well, that alone isn't an adverse employment action, that, you know, it's a conjury of facts that she's relying on. And surely it could fit in with a cluster of facts. Well, she's asserted four discrete actions that she says underlie or upon which she bases both the discrimination and retaliation claims. The reprimand is one of those. The AWOL charges. Right. And in typical lawyerly fashion, she would roll them all together and say this counts, and you would separate them out and say not this, not this, not this. In the formulation Ms. Walker uses, there's this pattern of behavior. Yeah. But as Judge Millett pointed out. I think it's Volette. I'll answer general. I'm not particular. My apologies, Your Honor. No, I'm not particular. My ancestors pronounced it your way, so you're fine. Okay. There's not a pattern here of antagonism or discrimination or retaliation against Ms. Walker. Mr. Leroy, the record shows, not only in the areas of leave, but also in her evaluation and performance awards, accorded her favorable treatment, ultimately fair treatment. We will call it favorable treatment in the context of the Title VII case. He approved multiple leave requests, both before the leave restriction letter and in the period after that. He nominated or wrote her up for performance awards over the course of the relevant period of time, in this case. He gave her an evaluation in 2009 that was Chief's Excellence. So there's not this uninterrupted pattern. There is no pattern, but there's not this uninterrupted conduct. There was one incident where she tried to invoke the right that was granted to her to take intermittent FMLA leave, and she left the message, I need to be with my mother today. And it seems like horrific circumstances that she was dealing with. And his explanation was, I wasn't sure if that was sick leave or not. I don't know how on earth you couldn't understand that as her invocation of her FMLA leave. And the fact that he came up with this sort of cockamamie, well, I need to be with my mother. Is that because you're sick? I mean, she's an adult woman. She doesn't need to be with her mother when she's sick. And didn't fix it afterwards, even when he knew the facts. Does that not suggest some hostility either to her on the basis of race or because of her being a troublemaking employee who files EEO complaints? No, Your Honor, and here's why. If we look at the record we show, is that on the day, I believe it's February 12, 2009, she emails Mr. Leroy and says in the title, FMLA sick leave, one-liner, I'm out today, I'm attending to my own. Out of sick leave, I'm attending to my mother. So that in and of itself is not consistent with the leave restriction letter. That's undisputed. Both Ms. Walker and her attorney in a grievance submission that he provided to DHS admit that she did not comply with, as they put it, the strict terms. Although counsel today says, yes, she did, because if it's unexpected, all it needs to be is notified later within a reasonable time. And you're saying she's waived that? No, what I'm saying is there was no notification to Mr. Leroy within a reasonable period of time. But she called and emailed. She doesn't explain the circumstances at all other than that she is attending to her mother and that she's taking sick leave. The next thing she does is when she returns. She said FMLA. Has she been authorized for FMLA sick leave for herself, as opposed to FMLA leave for taking care of her sick mother? Her FMLA had to deal with her mother's condition. Her sick mother. Right. So I have FMLA for my sick mother to take care of her, and I said FMLA sick leave, the one I've already been authorized for, and I need to take care of my mother. It seems to me it requires an awful lot of straining to go, I wonder if this is FMLA sick leave to take care of her mother. But then when Ms. Walker returns the following day, she submits a WebTA request, an automated leave request for annual leave. So there's this inconsistency already between what she says. Was it inconsistent or was she beginning to run out of FMLA leave at that point? If you look at the pay period timesheet and it's in the record, it shows she has sufficient both annual and sick leave. Although this was, you know, as happens in these situations, it was the day her mother had needs. She may well have wanted annual leave after that to recover from that day. Quite frankly, I might want it after that. Well, I mean, and this is not to diminish or discount in any way the circumstances that Ms. Walker may have found her in. The issue here ultimately was what Mr. Leroy understood, what her circumstances of the absence were to leave, and whether it was consistent in his mind with the leave restriction. Is there any evidence in the record about whether, one way or the other, about whether Mr. Leroy imposed sort of similarly scrutinizing pattern, this requirement of strict adherence to leave request policies on other employees? No, Your Honor. In fact, I think if I recall, I think this was an unprecedented situation, at least in the fine management unit. It wasn't a large unit. It had three or four employees. There was a greater part of the relevant period. So he didn't have to deal with this with anyone else, I believe, is what his declaration says. But to go back to this AWOL charge of February of 2009, she doesn't make or doesn't explain to Mr. Leroy. In fact, there's no indication that she ever explains to Mr. Leroy the exact circumstances of why she needs leave. Not that whether it was, you know, clarifying whether it was sick leave or annual leave, whether it really was FMLA. Mr. Leroy informs her that after she submits the annual leave request, that this isn't consistent with the leave restriction letter. I'm going to have to charge you AWOL for this day. Ms. Walker, in response, doesn't explain anything other than, thank you very much, have a nice day. Met perhaps sarcastically, but she doesn't engage with him or try to explain to him what the circumstances were. She doesn't do that until June of 2009, so three, four months later. And she does it in the context of some type of EEO affidavit where she actually explains for the first time these really dire circumstances. It's not even clear that that affidavit made it to Mr. Leroy at that time or any time. That's not indicated in the record. But our point is that there wasn't, under those circumstances, under those unspeakable facts, there wasn't reasonable notice to Mr. Leroy under circumstances as the leave restriction letter required. Okay. Thank you. Any other questions? Thank you. Thank you, Your Honor. We'll give you two minutes. I have confirmed from my brief that in George v. Levitt, this court said that usually pretext alone is sufficient. But also, since we are— Wasn't there the case, Go Back, where you came from, a woman from Trinidad? I mean, there was some actual direct evidence. But I think there may be some—we may be talking past one another a little bit in the sense that pretext is sometimes used as a shorthand for showing that the employer's proffered legitimate nondiscriminatory reason is false. But it's sometimes used to describe the pair of inquiries, which is that the employer's proffered nondiscriminatory reason is false and is a pretext for discrimination. The real reason is discrimination. So I think you're understanding pretext to be doing both jobs, both showing it to be false and that the real reason is discrimination. And I guess what I'm saying is that in order to be able to use it that way, I think you have to show both things. Basis for an inference, both that what they did was not the real— And I think that is the ultimate burden. It's very clear in our cases. And you can show that the real reason is race by showing that a decision-maker lied. And a jury can infer that they're lying because they're hovering up something that's illegal in this case. Why would we have said usually or ordinarily in those cases, then? I'm sorry? We always prefaced it with usually pretext is enough. Ordinarily it's enough. When wouldn't it be enough? Why didn't we just say— When there's another reason that's true, maybe that's also illegal but not the reason that they proffered. Such as, was she the only woman in the unit? She is. But there was no reason to think that that had anything to do with it. There's also the fact that he's inexplicably callous with regard to her mother. And there's the business impact analysis assignment. What do you mean inexplicably callous with respect to her mother? What evidence is that? I mean, the situation that her mother's in, it's just inhumane the way he responds to that. That he doesn't allow her to— You just heard the description from the attorneys for the government as to that sequence of events, that he didn't even learn about the very unfortunate circumstances until way later. Why does he assume that her— Okay, but then I don't think you can say someone's being very insensitive if they aren't informed of the circumstances. I mean, you had pretty strong words about him being callous. But if you didn't know the circumstances, you can't—my answer to your description of him as callous, you can't say he's callous because he didn't inquire. He knew that her mother had dementia. Yes. He also knew that she had taken time off because of car trouble and traffic. He had no reason to assume that her mother was in dire straits at that point. Well, she said, I need to attend to Mother today. And that's all she said, right? Yes. Okay, thank you. Yes, and there was not time for her to explain in the circumstances. You said she was the only woman. It's not material, I guess, because you're bringing a racial discrimination claim. But there was—wasn't Teresa Cline the fourth employee? There were two African-American men, and then there was— No, there's an Allen Cline. Well, there's also, I think, that fourth employee in her unit was Teresa Cline, who was the—I think that's the employee who got the highest employment rating during the cycle when Ms. Walker complained that she got rated inordinately low. I don't believe that's correct. I believe she's the only African-American female. And I understand in my brief I may have written it— I gave you twice, your brief twice, the fact that she was the only African-American employee. You made briefs, and after your error was called to your attention by the appellee brief, you still go back and make a statement about the five employees, of whom there were any, quite subordinately, of whom there were any. It's not just an inadvertence one time. It's twice that you were— And it is—but it still is inadvertence, and I apologize for that. I mean, I'm just looking at 599. This is a declaration of Raymond Badev. 599? Yeah, I mean, I don't want to go off on a sidetrack, but one employee, Teresa Cline, was rated outstanding. Two other employees, Carl Alberton and Theldaris Talley, were rated as achieving excellence. I assume Teresa Cline is a woman. Anyway. Is that a different— It might be a different period, but it's— Did she have a client overlive? Well, there are two Clines. The medical leave is the terminal leave before you retire. I think that was a guy. There are two Clines. There's an Alan Cline. I'm sorry. There are two Clines. There are two Clines. Or maybe someone here is making a mistake. That's where my confusion is coming from. I apologize. I'm not clear on the initial ordinance, because I did focus on the evidence of pretext. And if I can just say, there were two other times where— Very, very quickly. Ms. Delora's credibility comes into issue, and that's with the business impact analysis. He's telling her, you've got to get it in on time. You've got to get it in early. No, I can't look at it. No, I can't look at it. So he— What's the other one? We've read the briefs, so just refer to them. Okay. The workers' comp situation. He attaches a note when no one even asks him, because he's not our supervisor anymore, that he's never seen any evidence of this. But at his deposition, he testified that he saw medical documentation that she had stress-induced asthma from work. Did you produce the note he wrote that supposedly said he had not seen any evidence? Yes. The note is in the documents. Thank you. Do you want to know where it is? I can— Yeah. I didn't find it, but that's perfectly possible that it's there, and I didn't find it. 471. 471. No, that's just a transcript. Yeah, that's a transcript where there's a reference. Oh, wait, wait, wait. Is it 454? I do have it. Oh, my God. I thought I had it. If it's in here, I— It is in there. You can send a letter. Send a letter. I'm sorry. I don't want to delay things over what— Are you talking about where— It's 408. 408. Okay. Yeah, there it is. Okay, thank you. Great. Thank you. And he writes the wrong year on that, just so you know. That was 2010, and he writes that it was 2009. Got it. That happened in January. Yeah. Yeah. Okay. Thank you. Thank you very much. Okay.
judges: Millett, Pillard, Sentelle